11-2546-ag
Yu v. Holder

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

_____

August Term, 2012

(Argued: April 16, 2012                    Decided: September 7, 2012)

Docket No. 11-2546-ag

_____

RUQIANG YU,

*Petitioner*,

v.

ERIC H. HOLDER, JR., ATTORNEY GENERAL,

*Respondent*.

Before: JACOBS, *Chief Judge*, B.D. PARKER, & HALL, *Circuit Judges*.

Ruqiang Yu petitions for review of a decision of the Board of Immigration Appeals that affirmed the Immigration Judge's decision denying Yu's application for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). We conclude that the BIA applied an erroneous legal standard when assessing whether Yu's opposition to corruption constituted an actual political opinion. We hold also that the BIA erred by failing to consider Yu's claim of imputed political opinion. Accordingly, we grant the petition for review and remand for further consideration.

Petition for review **GRANTED**.

_____

EMANUEL LIU, Jiang & Liu, Attorneys at Law,
Flushing, NY & Mark C. Fang, Law Office of Mark
C. Fang*, White Plains, NY, *for Petitioner*.

JENNIFER PAISNER WILLIAMS, Senior Litigation
Counsel, Office of Immigration Litigation,
Department of Justice, Washington, DC (Tony
West, Assistant Attorney General, Civil Division,

David V. Bernal, Assistant Director, on the brief),
*for Respondent*.

BARRINGTON D. PARKER, *Circuit Judge*:

Ruqiang Yu ("Yu"), a native and citizen of the People's Republic of China, petitions this Court for review of a decision of the Board of Immigration Appeals ("BIA") affirming the decision of Immigration Judge ("IJ") Sandy K. Hom denying Yu's application for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT").[1] *See* Ruqiang Yu, A087 560 843 (BIA May 31, 2011), aff'g IJ Removal Decision (Immig. Ct. N.Y.C. April 14, 2010). The IJ found that Yu credibly testified that, while an employee and a team-leader at a state-run airplane factory in Shanghai, his employer corruptly refused to pay the wages of workers on his team and that, when Yu's efforts to aid the workers and to bring the corruption to the attention of government officials was discovered, he was jailed and later fired. The IJ and the BIA nonetheless concluded that, because the corruption Yu opposed was "aberrational," as opposed to "endemic," he had failed to establish his eligibility for asylum.

We conclude that the BIA failed to consider Yu's opposition to corruption in its full factual and political context, and we reject the BIA's conclusion that opposition to corruption at one workplace – without evidence that the corruption extended to other workplaces – cannot serve as the basis for asylum. Finally, we conclude that the BIA erroneously failed to consider

---

[1] Yu did not appeal the IJ's denial of his CAT claim to the BIA, so we lack jurisdiction to consider it. *See* 8 U.S.C. § 1252(d)(1); *Karaj v. Gonzales*, 462 F.3d 113, 119 (2d Cir. 2006).

2

Yu's claim of imputed political opinion. Accordingly, we grant the petition for review and remand the case to the BIA for further consideration.

**BACKGROUND**

Yu entered the United States in February 2009 on a B-1 business visa. In May 2009, he filed an application for asylum claiming past persecution and a fear of future persecution on account of his political opinions. *See* Assessment to Refer, Immigration and Naturalization Service, New York Asylum Office, Aug. 5, 2009. His application was initially deemed not credible and, in September 2009, Yu was served with a Notice to Appear ("NTA") charging him with removability, at which point he requested a hearing. At his hearing, Yu conceded removability and applied for asylum, withholding of removal, and CAT relief. The following facts are taken from his I-589 Application for Asylum and his testimony before the IJ, which was found to be credible.

Yu testified that he worked for seven years as a technician and a team-leader at the Shanghai Airplane Manufactory, a state-run airplane factory. Yu's team included several workers who had previously been farmers. According to Yu, the factory officials told a number of the former farm workers that, because business was slow, their salaries would not be paid. However, because of his position, Yu knew the factory was not in poor financial condition and that the factory officials embezzled money intended for the workers and spent it lavishly on themselves. For these reasons, he was "totally against the factory's leaders."

When a worker on Yu's team asked Yu to intervene on his behalf to secure the release of his wages, Yu agreed to do so and spoke to a supervisor who "warned [Yu] that [he] was an

3

official employee and . . . . [he] shouldn't stir trouble for these . . . workers." After about a month, when the worker still had not received his wages, Yu wrote an anonymous letter to the Shanghai Anti-Corruption Bureau revealing the names of factory officials who had been involved in the embezzlement. He signed the letter "a worker with conscience."

Yu further testified that, after sending the letter, a number of workers in other groups approached him. These workers "hoped [Yu] could bring them to see the factory officials to report their situation." According to Yu, "[m]ore than 10 workers, led by [him] went to see [the] Vice General Manager who [was] in charge of [the] finance department of [the] factory." However, the manager's secretary treated "[them] very bad . . . . [and one worker] shouted to the secretary that he didn't get paid and had no money for food." The secretary called security and the group was "banned from the office building."

The next day, four policemen came to Yu's workplace, handcuffed him, took him to a police station, and charged him with "disrupt[ing] . . . soci[etal] peace." He testified that three officers interrogated him for four to five hours, showing him a copy of the anonymous letter and asking whether he had written it. Although Yu denied being the author, the police insisted that they had confirmed his handwriting and struck him each time he denied being the author. Yu further testified that the police detained him for two weeks, during which time he was beaten by the other inmates on account of his anti-corruption activities and threatened with indefinite detention if he did not sign a letter retracting the charges he had levied. He signed such a letter, admitting that he purposefully organized workers to cause trouble and to undermine social order, and he promised not to write additional letters of complaint or to organize workers. As punishment for this behavior and to secure his release, his family was required to post a 7,000

RMB ($1,110 USD) bond. After his release, he returned to work but was fired a short time later. Thereafter, he was subjected to visits and ongoing harassment by the police, and, in February 2009, he fled China.

In his asylum application, Yu characterized his conduct as political. He testified that he acted out of concern for his co-workers and in an attempt to prevent the embezzlement of their wages. Yu also testified that the authorities imputed a political opinion to him, believing that he was actively assisting workers who were promoting social unrest.

The IJ found Yu's testimony credible and consistent with his asylum application. The IJ noted that retaliation for challenging government corruption in some circumstances can constitute a political opinion. However, he concluded that, "where the respondent [is] directing his complaint against individuals who [take] advantage of their position, who engaged in embezzlement and corruption, this, the Court finds, to be aberrational." Having found that the corruption was "aberrational" and "was due to greed and [] theft," the IJ concluded that Yu was not eligible for asylum.

The BIA affirmed the IJ. It concluded that Yu failed to establish that his actions "constitute[d] a political challenge directed against a governing institution" since he was objecting to "aberrational" corruption by individuals. BIA Op. at 2. The BIA did not consider whether a political opinion was imputed to Yu. Instead, it held that Yu did not meet his burden because he did not "establish that endemic corruption occurs [at the Company] with the complicity of the State." *Id*. Yu's actions, the BIA reasoned, were "a personal dispute against his individual employers for misusing funds he believed should have gone toward the unpaid wages of the laborers on whose behalf he sought to intervene." *Id*.

5

Because the BIA adopted and affirmed the IJ's decision, we review the two decisions in tandem. *Yan Chen v. Gonzales*, 417 F.3d 268, 271 (2d Cir. 2005). We review *de novo* questions of law regarding "what evidence will suffice to carry any asylum applicant's burden of proof." *Joaquin-Porras v. Gonzales*, 435 F.3d 172, 181 (2d Cir. 2006) (internal quotation marks omitted). We will vacate BIA decisions that result from flawed reasoning or the application of improper legal standards. *See Rizal v. Gonzales*, 442 F.3d 84, 89 (2d Cir. 2006).

**DISCUSSION**

To establish eligibility for asylum under the Immigration and Nationality Act, an applicant must meet the definition of a "refugee," defined as one who is "unable or unwilling to avail himself or herself of the protection of [his or her native] country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). To establish persecution on account of a political opinion, the asylum applicant must demonstrate "that the persecution arises from his own political opinion, actual or imputed." *Castro v. Holder*, 597 F.3d 93, 100 (2d Cir. 2010).

Persecution on account of a political opinion is a ground for asylum when committed by the government or by private actors whose actions the government has proven unwilling or unable to control. *See Pavlova v. INS*, 441 F.3d 82, 91 (2d Cir. 2006). Both this Court and the BIA recognize that opposition to corruption may contain a political dimension that constitutes a protected ground. *See Yueqing Zhang v. Gonzales*, 426 F.3d 540, 547-48 (2d Cir. 2005) (holding that retaliation for opposition to government corruption can constitute persecution on account of a political opinion); *Matter of N-M-*, 25 I&N Dec. 526 (BIA 2011) ("[O]pposition to state

6

corruption may provide evidence of an [applicant's] political opinion or give a persecutor a reason to impute such [an opinion]").

In *Osorio v. INS*, 18 F.3d 1017 (2d Cir. 1994) we held that determining "whether a given individual[] . . . manifests a political opinion requires examination of the 'political context' in which the dispute took place in order to determine whether the dispute bears a 'political dimension.'" *Zhang*, 426 F.3d at 547 (quoting *Osario*, 18 F.3d at 1029); *see also id.* at 546 (noting that, when assessing whether actions express a political opinion, courts must "undertake the analysis required by our decision in [*Osario*]"). This analysis necessarily involves a "complex and contextual factual inquiry into the nature of the asylum applicant's activities in relation to the political context in which the dispute took place." *Castro*, 597 F.3d at 101 (internal quotation marks omitted). Because the form and nature of political opposition can vary widely, the assessment of when opposition to corruption becomes an expression of a political opinion involves a context-specific, case-by-case determination.

We conclude that the BIA did not adequately engage with the facts or the political context of Yu's activities. First, we note that the BIA's factual conclusion that Yu opposed "aberrational" corruption is not supported by the record. Conduct is "aberrational" if it is "a deviation or departure from what is normal, usual, or expected" or something that is "abnormal, diverging from the norm." Oxford English Dictionary (June 2012, online ed.) (defining "aberration"). Yu's application indicated that "*quite a few* . . . workers in other groups did not get paid *for a few months*," and that he personally escorted ten of them to confront factory officials. These facts indicate that the non-payment of wages was apparently recurring, not aberrational.

7

Second, the appropriate inquiry does not focus simply on the number of corrupt acts, but on an assessment of the overall climate and context in which the opposition takes place. Where opposition to corruption transcends self-protection and represents a challenge to state-sanctioned modes of official behavior, a petitioner may be eligible for asylum. *See Castro*, 597 F.3d at 100-101; *Zhang*, 426 F.3d at 547-48; *Osorio*, 18 F.3d at 1028-31.

The fact that the protests organized by Yu challenged corruption at a single workplace does not render the corruption categorically aberrational without regard to the nature of Yu's conduct.[2] In several ways, Yu's conduct is typical of political protest (and may have been perceived as such by the authorities). Thus, the record indicates that Yu had no personal, financial motive to oppose the corruption, undertook to vindicate the rights of numerous other persons as against an institution of the state (a state-owned factory), and suffered retaliation by an organ of the state – the police. *Cf. Castro*, 597 F.3d at 100 ("Although opposing corruption for purely self-interested reasons may lack a political motivation, opposition to endemic corruption . . . may have a political dimension when it transcends mere self-protection and represents a challenge to the legitimate authority of the ruling regime." (quoting *Zhang*, 426 F.3d at 547-48)); *Zhang*, 426 F.3d at 547 (noting with approval petitioner's argument "that the dispute became political when [the petitioner] decided to marshal support from similarly afflicted business owners and to attempt to publicize and criticize endemic corruption extending beyond his own case").

It does not appear to us that either the IJ or the BIA assessed Yu's claim in its full factual

---

[2] The issue is sharply presented here because Yu failed to present before the BIA evidence of more broad-based corruption at state-owned factories in his native land.

8

context.  Key parts of Yu's credible testimony appear not to have been considered at all.  For example, Yu testified that his opposition to the wage theft was not grounded in a desire to recoup his own wages, but to assist others.  Neither the IJ nor the BIA discussed this fact.  The BIA also failed to mention that Yu organized and accompanied other workers to demand their wages.  The IJ and BIA never discussed whether Yu's views on wage theft within the factory constituted a challenge to the legitimacy of the government's entrenched modes of conduct.  While the BIA is not obliged to recite every fact, its failure to meaningfully engage with the record showcases its failure to assess Yu's claim under the correct legal standard.  Accordingly, we remand his application for further review.

Finally, we note that the BIA failed to consider Yu's contention that Chinese authorities imputed a political opinion to him.  A political opinion is "imputed" when an individual has a political opinion attributed to him – correctly or incorrectly – on account of his beliefs, actions or associations.  *Chun Gao v. Gonzales*, 424 F.3d 122, 129 (2d Cir. 2005).  Yu raised an imputed political opinion claim to the IJ and the BIA.  Specifically, he argued:

> As is recognized in the Country Report published by the United States Department of State, workers' wages [have] been a primary source of political tension, including violent tension, for the Chinese government.  Respondent's complaint – workers not receiving their pay because of their greedy and corrupt leaders is inherently, quintessentially, a political opinion.  Certainly this is how the Shanghai government, in arresting respondent and jailing him for fourteen days, viewed respondent's complaint letter.

Resp't Br. in Supp. of Appeal to the BIA, at 5-6, July 13, 2010[3]

---

[3] Although not part of the certified administrative record, both State Department reports on China and a well-known China scholar have observed that corruption is most concentrated in areas heavily controlled by the government.  *See, e.g.*, U.S. Dep't of State, 2011 Country Report on Human Rights Practices: China, at 45, *available at* http://www.state.gov/documents/organization/186478.pdf (last

When the issue is raised, the BIA is required to address it. *See Delgado v. Mukasey*, 508 F.3d 702, 707 (2d Cir. 2007). As previously noted, Yu presented credible testimony that the police forced him to admit that he purposefully organized workers, charged him with undermining the social order, and detained him until he promised to refrain from lodging any future complaints. Although these facts suggest that the police may have imputed political opinions to Yu, the IJ and the BIA failed to consider this issue.[4] On remand, the BIA should consider it in the first instance. *See Gonzales v. Thomas*, 547 U.S. 183, 186 (2006) (per curiam).

**CONCLUSION**

The petition for review is granted. We vacate the BIA's decision and remand to the BIA for further proceedings consistent with this opinion.

_____

visited Sept. 4, 2012); Minxin Pei, Carnegie Endowment for Int'l Peace, *Corruption Threatens China's Future*, at 2-3 (Oct. 2007), *available at* http://www.carnegieendowment.org/files/pb55_pei_china_corruption_final.pdf (last visited Sept. 4, 2012). The 2008 State Department report also specifically discussed the government's surveillance and use of force and detention to suppress workers who demanded unpaid wages. *See* U.S. Dep't of State, 2008 Country Report on Human Rights Practices: China (Feb. 25, 2009) ("Authorities used force to suppress the demonstrations [over unpaid wages], bringing criminal charges against the protestors, and continued to use administrative detention, which is not subject to judicial review, as a penalty for involvement in such protests."), *available at* http://www.state.gov/j/drl/rls/hrrpt/2008/eap/119037.htm (last visited Sept. 4, 2012).

[4] The BIA considered whether the retaliation against Yu was "motivated by political concerns." It did not address whether political concerns were attributed to Yu.